CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
9/23/2025
LAURA A. AUSTIN, CLERK
BY s/ S. MELVIN
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

CLAUDE DAVID CONVISSER, )
)
Plaintiff, )
)
v. ) Civil Action No. 3:25-cv-00079
)
THE HAVEN AT FIRST AND MARKET, INC., )
)
Serve: J. Thomas Everett II, Registered )
Agent or Own Brennan, Executive Director )
112 West Market Street )
Charlottesville, Virginia 22902, )
)
Defendant )

## VERIFIED COMPLAINT

Plaintiff Claude David Convisser ("plaintiff"), by counsel, states pursuant to 28 U.S.C. section 1915 as his verified complaint against defendant The Haven at First and Market, Inc. t/a The Haven ("the Haven"), under Title III of the Americans with Disabilities Act, 42.U.S.C. sections 12101, *et seq.*, dealing with public accommodation, as follows:

I, Claude David Convisser, plaintiff hereof, declare under penalty of perjury that the factual matter stated following is true:

## SUBJECT MATTER JURISDICTION

1. Original subject matter jurisdiction in this Court is premised on Title 28 U.S.C. section 1331.

## PERSONAL JURISDICTION

2. Defendant the Haven is a non-profit, non-stock corporation established under the laws of Virginia with its principal place of business within the jurisdiction of the Charlottesville Division of this Court.

## VENUE

3. Venue lies properly in this Court pursuant to Title 28 U.S.C. section 1391(b)(1), 1391(b)(2), and 1391(b)(3).

## PARTIES

4. Plaintiff is a homeless man who happens to be a lawyer on active status and in good standing with the Virginia State Bar. He has been homeless living in the Charlottesville area since June 25, 2024. While working towards recouping an income, he lives in a one-man tent in the Shenandoah National Park.

5. Defendant operates the Haven Day Shelter for the Homeless in downtown Charlottesville.

6. The Haven aims to "provide a safe and welcoming space for the homeless and very poor in Charlottesville." The Haven IRS Form 990 for 2023. The Haven does not impose or ask for any charge or fee from guests like plaintiff for any of its services.

7. Plaintiff has been going to the Haven for breakfast six days out of seven since July 2024, taking a shower there on average every other day, doing his laundry once every few weeks there, and benefitting from other services it has to offer *gratis* to homeless men and women like him. These services have been and remain life-saving for him.

8. With the exceptions described below, the Haven has welcomed plaintiff as a guest, just as it treats all of the other homeless persons utilizing its services as guests.

## FACTS

### Plaintiff's Physical Disabilities

9. Plaintiff suffers from two disabilities relevant to this cause, both physical impairments that substantially limit one or more of his major life activities.

10. Plaintiff's first disability is a bunion on his right big toe, or bony bump that formed on the joint at the base on the inner-foot side of his right big toe, as a result of the bones in the front part of the foot moving out of their normal position.

a. This creates a large bump on the inner side of his foot at the big toe which means that his right foot does not fit into shoes that, without the bunion, his size-11 men's sized right foot would be able to fit into.

b. If he uses bigger shoes to accommodate the bunion, then the bigger-sized left shoe is too big for his left foot and he has trouble walking, while the right shoe, aside from fitting around his bunion, is also too big for his right foot, compounding the impairment on his ability to walk.

c. Therefore, plaintiff has to have all of the shoes for his right foot, with the exception stated in subparagraph (d), specially fabricated and cobbled by cutting a large whole in the fabric, leather or plastic where the bunion creates the bulge and stitching over it a patch that enlarges the interior space to fit over the bunion on his right foot.

d. In the case of winter boots that are too thick to cut, he wears rubber boots that are bigger than his normal size 11, such as size 13, to fit over the bunion and allow his right foot entry to the boot. Extra-large size 13 boots allow him, at least, to walk short distances during the wintertime or wet weather, or to ride his bicycle when it is raining or snowing during the wintertime to prevent his feet from becoming wet and frozen.

11. Provided plaintiff can wear his specially-cut shoes accommodating the disability of his bunion, he can walk. However, if these shoes become unavailable to him, without his specially cut shoes or extra-large sized winter rubber boots, his ability to engage in the major life activity of walking outdoors, particularly in cold or wet weather, and walking indoors in, and gaining access to, places that require shoes, such as restaurants, dining halls, offices and businesses, is substantially limited. 42 U.S.C. § 12102(1) and (2) (definitions of "disability," "physical impairment that substantially limits one or more major life activities," and "major life activities").

12. Therefore, plaintiff has two pairs of walking shoes made from leather and fabric, size 11, specially cut on the right shoe to fit around his bunion, to enable him to walk ("plaintiff's specially-cut and disability-mitigating shoes"). He always keeps a second pair as a back-up for when the first pair becomes wet and needs some time to dry, especially during rainy or colder weather during the wintertime. Without having a second, dry, back-up pair of shoes specially cut to fit the bunion on his right foot, he would not be able to walk when the first pair gets wet, especially outdoors during the wintertime, which soaking happens on average around once per month. He uses both of these pairs of specially-cut and disability-mitigating shoes when bicycling. Each sturdy pair cost around $125 in the years 2021 and 2022; to have the right shoe specially cut in the United States today would cost at least $50, money he does not have available in his present indigent status.

13. Plaintiff's second disability is an episodic impairment that at the moment is in remission, but when active, it substantially limits his ability to sit on a chair or a bicycle. 42 U.S.C. § 12102(4)(D). This condition is "butt boils," which arise when he wears padded bicycle shorts or underwear that are not clean and the sweat and grime that have soaked into the padding

or fabric contaminate and infect his skin on his buttocks. This condition, which can become quite painful, arises not infrequently if plaintiff wears the same pair of bicycle shorts more than two days in succession. Since plaintiff does not own a car and instead, he bicycle-commutes to-and-from his work, plus additional bicycling during the day, an average of 50 miles per day, his having and being able to change into a clean and dry pair of padded bicycle shorts every other day is imperative to avoid this disability of "butt boils" from resurfacing and to help it dissipate if it does arise.

14. Therefore, plaintiff hand washes and cleans his padded bicycling shorts once every other day in the men's restroom at defendant the Haven. He has four pairs that he wears, cleans, and allows to dry in succession.

**Plaintiff's Access to and Use of a Plastic Storage Bin at the Haven**

15. Beginning on November 4, 2024, defendant the Haven let plaintiff have exclusive use of one of its 65 plastic bins, each one measuring approximately 10,000 square inches, or 65,000 square centimeters, in volume, which it reserves for guests to store their clothing and personal effects inside of, located on five shelves against one of the walls in the Haven Day Shelter mail room.

16. The purpose of the bins is to enable homeless people like plaintiff to be able to store some of their clothing and personal effects in a setting that is clean, dry and somewhat secure (the bins are not locked) while they navigate their overnight homeless status while trying to gain or, in plaintiff's case, restore income. From their storage bins, they can have access to ad pick up a change of fresh clothing and personal effects daily.

17. The 65 plastic bins sit on five shelves of 13 bins each. There are approximately six inches of space behind each plastic bin to the back wall, if the bin is flush with the front edge

of the shelf; four inches of space between the top of each plastic bin and the shelf above it, and four inches of space between and on the side of stored plastic bins.

18. Since November 4, 2025, plaintiff has stored his second pair of specially-cut and disability-mitigating shoes, his back-up pair, in the space behind or on top of his plastic bin on the second-lowest of the five shelves in the Haven Day Shelter mail room. If this second pair is one that is drying after having become wet in the rain, it can take as long as a week for it to dry passively in this manner.

19. A cobbler advised plaintiff not to put his specially-cut and disability-mitigating shoes inside a commercial electric clothes drying machine because the heat will loosen the glue holding the rubber soles to the fabric upper part of the shoes.

20. Plaintiff also has been leaving his most-recently washed pair of padded bicycle shorts to dry passively on top of his plastic bin. It takes two to three days for one pair of cleaned bicycle shorts to dry in this manner.

21. The Haven has commercial drying machines, but often, only one of them is in working order, the Haven staff use it to dry bath towels and washcloths, and other guests use it to dry loads of their clothing after having washed them in the washing machines that occasionally work at the Haven. Typically, guests do not share resources like drying machines by putting their clothes together therein, because it may lead to disputes between them. Therefore, plaintiff's drying his padded bicycle shorts in the Haven's commercial clothes drying machine is not a practical or available solution, after he washes and cleans them by hand in the men's room.

22. If plaintiff were to apply a hand-held, electric blow-dryer, the forced hot air would similarly weaken the glue on his specially-cut and disability-overcoming shoes, if they were soaking wet, and it would take hours and hours of use to dry his wet, padded bicycle shorts.

23. Plaintiff does not have any place where he can leave his specially-cut and disability-mitigating shoes and his padded bicycle shorts to dry outside in the sun for the necessary duration for them to dry, that is secure and where these items will not get stolen.

24. Haven Day Shelter Supervisor employee LaQuinn Gilmore, and likely other of the six Day Shelter Supervisors, knew of plaintiff's physical disability of the bunion on his right foot and his disability of butt boils, and that plaintiff was storing his extra pair of specially-cut and disability-mitigating shoes, whether wet or dry, along with one pair at-a-time, wet, of his padded bicycle shorts, on top of and behind his plastic bin.

25. Since November 4, 2024, except for one occasion in July or so 2025, when defendant the Haven by LaQuinn Gilmore directed in writing all plastic bin-users to clear out everything they were storing behind, on top of, or on the side of their bins by a date certain, or Haven staff would collect and discard it, many Haven guests like plaintiff, if not most of them, have stored items behind, on top of, and beside their individual and personal plastic bins.

26. Plaintiff's storing his specially-cut and disability-mitigating second set of shoes, whether wet or dry, behind or on top of his plastic bin, and leaving a single pair of padded bicycle shorts to dry on top of his plastic bin, has not caused any difficulty, trouble or inconvenience for Haven staff or other guests.

27. With plaintiff's second pair of specially-cut and disability-mitigating shoes stored behind or on top of his plastic bin and a single pair of padded bicycle shorts drying on top of his plastic bin, his plastic bin does not protrude beyond the edge of the shelf on which it sits, to obstruct the Day Shelter mail room's pedestrian passageway or work space adjoining the bin shelves in any way. Nor have his items interfered with use of the neighboring plastic bins by other Haven guests.

28. Meanwhile, many other Haven guests with bins leave all kinds of clothing and other items on top of and on the sides of their bins and because of items stored behind their bins, they protrude well beyond the shelf edge into the pedestrian passageway and work space of the Day Shelter mail room.

29. As far as plaintiff is aware, no other guest of defendant the Haven has ever been disciplined for storing any time on top of or behind his or her plastic bin.

**Plaintiff's Request for a Reasonable Accommodation**

30. From September 14 and 16, 2025, plaintiff expressly requested in writing a reasonable accommodation under the Americans With Disabilities Act for his two physical disabilities described above by three emails he sent to defendant the Haven's Executive Director Owen Brennan, its Operations Director Ocean Aiello, and the Day Shelter Director Jamey Rush. These emails explained the two physical impairments plaintiff has and the need to leave his specially-cut and disability-overcoming shoes and padded bicycle shorts outside his plastic bin, behind it or on top of it, to dry properly, so that his disabilities would not disable him from major life activities or in the case of the butt boils, recur or worsen.

31. The Haven staff Jamey Rush on September 15 and then Owen Brennan on September 16, 2025 rejected plaintiff's request in writing for reasonable accommodation.

**The Haven's Retaliation and Threatened Suspension**

32. On September 22, 2025, the Day Shelter Supervisor who told plaintiff his name is Larry, but whose name may actually be Abraham Forte, followed plaintiff from the front entrance of the Haven Day Shelter to the Day Shelter mail room to observe plaintiff removing his bin and exchanging items in it. He told plaintiff that he could no longer store any items on top of or behind his bin. Plaintiff objected and asked what would happen when his shoes which

Larry saw stored behind his plastic bin got wet and he needed to dry them, where would he put them to dray? Plaintiff complained verbally that if he were forced to put these shoes or his wet, padded bicycle shorts inside his plastic bin, they would never dry and instead, would become moldy, and he would not be able to use them. Larry replied that he was aware plaintiff had made a request for accommodation under the Americans With Disabilities Act, but Owen Brennan had conferred with defendant the Haven's law firm and Owen's direction was that plaintiff should no longer be allowed to store his wet or dry specially-cut and disability-overcoming shoes, or his wet padded bicycle shorts, behind or on top of his plastic bin. Larry threatened to suspend plaintiff for two weeks if he did not put these items inside his bin and said he was being nice for not suspending him immediately.

33. The policy of requiring all guests to store all items inside their bins is not stated on defendant the Haven's document titled Shelter Rules and Policies that Executive Director Owen Brennan gave plaintiff in June 2025.

34. Defendant the Haven's Shelter Rules and Policies state: "Our shift supervisors and departmental staff have the authority to suspend anyone not following our house rules. You could be asked to leave for the day, or be suspended from The Haven services and even banned from The Haven property… Day to day operating rules must be followed or you will be subject to a one, two, or seven-day suspension, or more, based on repeated behavior and supervisor discretion."

35. Day Shelter Supervisor LaQuinn Gilmore had said to plaintiff once months ago that guests were not supposed to store items behind their bins. On that occasion, he asked if plaintiff was storing illicit drugs behind his, and plaintiff replied, "No, body parts. Please let me know if they start to smell." The two men had laughed together at the bad joke, and that was it,

plaintiff left his items there. Neither LaQuinn Gilmore, nor any other staff of the Haven, ever asked or told plaintiff to remove his specially-cut and disability-mitigating shoes or padded bicycle shorts from behind or on top of his plastic bin, except for the general cleaning that took place in July 2025 noted in paragraph 25 above, until Larry's request and threat made on September 22, 2023.

36. Larry's threat of a two-week suspension made on September 22 was disproportionate to any possible infraction committed by plaintiff, if his conduct was even an infraction of defendant the Haven's policy, if the Haven even has an applicable policy, which plaintiff argues strongly it does not and was not, based on the following recapitulation of facts:

a. Haven staff had allowed plaintiff to store some of his items on top of and behind his plastic bin without objection since November 2024.

b. Haven staff knew plaintiff was storing medically-necessary items behind and on top of his plastic bin.

c. Plaintiff's medically-necessary items stored outside of his plastic bin did and do not inconvenience others using the Day Shelter mail room at all; with his shoes behind his bin, it did not protrude across the edge of the bin shelf, nor his items outside his bin impede other guests from gaining access to their bins.

d. Many other guests of defendant the Haven to this day store items outside their bins, which items and bins protrude into the pedestrian passageway and work space of the Day Shelter mail room, all without adverse consequences to those guests.

e. The published Day Shelter Rules and Policies do not proscribe guests storing items behind or on top of their bins and are silent on this subject.

f. It was only after and as a result of plaintiff's raising the subject of a reasonable accommodation under the Americans With Disabilities Act that defendant the Haven told him on threat of a disproportionate suspension by Larry as relayed from Owen Brennan that plaintiff must put his specially-cut and disability-mitigating shoes and wet, padded bicycle shorts inside his plastic bin, and could no longer store them on top and behind it.

37. If plaintiff continues to comply with Larry and Owen Brennan's directive ("defendant the Haven's directive"), as soon as the wet weather returns, which will happen any day now, and plaintiff's specially-cut and disability-mitigating shoes get wet and as a result of defendant the Haven's directive, plaintiff is unable to dry them and then his back-up pair also gets wet, and at present without the ability to dry his washed, padded bicycle shorts, defendant the Haven's directive nullifies his abatement of the impairing effects of both of his physical disabilities, leaving him potentially imminently with the inability to engage in the major life activities of walking and sitting.

38. Now having been issued defendant the Haven's directive, if plaintiff defies it and continues surreptitiously to store his specially-cut and disability-overcoming shoes, whether wet or dry, and his wet, padded bicycle shorts behind and on top of his plastic bin, and if the Haven finds out and as a result, suspends or bans him from its premises, then he will lose the benefit of all of its services, which he has depended on since July 2024 to remain fed, bathed, with clean clothing, and in other respects.

## LEGAL CLAIMS

## COUNT 1

### Unlawful Discrimination in Public Accommodation

**Subchapter III of the Americans With Disabilities Act, 42 U.S.C. section 12181, *et seq.***

39. Plaintiff reiterates paragraphs 1 through 38 above and incorporates them by reference as if restated herein.

40. Defendant the Haven owns and operates a public accommodation, 42 U.S.C. section 12182(a), because it is a homeless shelter that affects commerce, meaning travel, trade, traffic, commerce, transportation or communication among the several States and between points in the same State but through another State. 42 U.S.C. § 12181(1)(A), (1)(C), and (7)(K).

41. Defendant the Haven is effectively denying plaintiff the opportunity of participating in or benefiting from all of its services by nullifying his abatement of his two physical disabilities, so that he will be unable to walk to and sit at its facility and premises (as well as anywhere else). 42 U.S.C. § 12182(b)(1)(A)(i).

42. Defendant the Haven is denying plaintiff on the basis of his two disabilities participation in or benefit from the service of use of its storage bins on terms that are not equal to that afforded its other guests, in that they are allowed to store items on top of, behind, and next to their plastic bins, but he is no longer permitted to do so. 42 U.S.C. § 12182(b)(1)(A)(ii).

43. Defendant the Haven has failed to make a reasonable modification in its policies or practices, when such modification is necessary to afford such services to plaintiff. 42 U.S.C. section 12182(b)(2)(A)(ii).

44. Defendant the Haven cannot demonstrate that making the modification plaintiff requested of allowing him to store his second pair of specially-cut and disability-mitigating shoes, his rubber boots come cooler weather, and one pair-at-a-time of his padded bicycle shorts behind and on top of his plastic bin would fundamentally alter the nature of its goods, services, facilities, privileges, advantages or accommodations. 42 U.S.C. section 12182(b)(2)(A)(ii).

45. Without defendant the Haven's reasonable modification, plaintiff is at risk of suffering substantial impairment of his ability to engage in the major life activities of walking and sitting, thus severely disabling him, potentially leading proximately to severe injury and conceivably death.

**<u>COUNT 2</u>**

**Retaliation for Exercising Rights**
**<u>against Unlawful Discrimination in Public Accommodation</u>**

**42 U.S.C. §§ 12188(a)(1), 2000a-2(b) and (c)**

46. Plaintiff reiterates paragraphs 1 through 45 above and incorporates them by reference as if restated herein.

47. Plaintiff is being subjected to discrimination on the basis of disability in violation of Subchapter III of the Americans With Disabilities Act, 42 U.S.C. section 12181, *et seq.*

48. Therefore, the remedies set forth in 42 U.S.C. section 2000a-3A are available to him. 42 U.S.C. §§ 12188(a)(1).

49. Defendant the Haven by its directive to plaintiff has intimidated, threatened, and coerced, or attempted to intimidate, threaten or coerce him with the purpose of interfering with his right or privilege secured by Subchapter III of the Americans With Disabilities Act, 42 U.S.C. section 12181, *et seq.* to be free of discrimination in public accommodation by asking it for a reasonable accommodation to or modification of its policy and practice. 42 U.S.C. § 2000a-2(b).

50. Defendant the Haven by its directive to plaintiff has punished him by ordering him to stop storing his specially-cut and disability-mitigating shoes and wet, padded bicycle shorts outside his bin, or else if he refuses to go along, it has imperiled him with a suspension of all of its life-saving services rendered him, because he exercised his right or privilege secured by Subchapter III of the Americans With Disabilities Act, 42 U.S.C. section 12181, *et seq.* to be free

of discrimination in public accommodation by asking it for a reasonable accommodation to or modification of its policy and practice. 42 U.S.C. § 2000a-2(c).

51. Defendant the Haven's attempted and actual intimidation, threat, coercion and punishment show clearly that he is likely to suffer irreparable harm absent temporary, preliminary and permanent injunctive relief.

**COUNT 3**

**Claim for Relief for Deprivation of, Interference with, and Punishment for Exercising Rights against Unlawful Discrimination in Public Accommodation**

**42 U.S.C. §§ 12188(a)(1), 2000a-2(a), (b) and (c), and 2000a-3(a) and (b)**

52. Plaintiff reiterates paragraphs 1 through 51 above and incorporates them by reference as if restated herein.

53. Because defendant the Haven has engaged in an act or practice, and there are reasonable grounds to believe it is about to engage in the foregoing acts or practices, prohibited by 42 U.S.C. section 2000a-2, aggrieved plaintiff is entitled to preventative relief, including a temporary restraining order and temporary, preliminary and permanent injunctions. 42 U.S.C. § 2000a-3(a).

54. Plaintiff as the prevailing party will be deserving of an award of its reasonable attorney's fees as part of the costs paid for by defendant the Haven. 42 U.S.C. § 2000a-3(b).

55. Plaintiff pleads further that this Court authorize commencement of this legal action without his payment of fees or costs, and that the Court order the U.S. Marshall to effect service at no cost to plaintiff. 42 U.S.C. § 2000a-3(b).

56. If the Court authorizes commencement of this legal action without plaintiff's payment of fees or costs, he will immediately file a motion for a temporary restraining order pursuant to Rule 65 of the Federal Rules of Civil Procedure and case law. Winter v. Nat. Res.

Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 35, ___ (2008); Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017).

57. Plaintiff gives the necessary certification next pursuant to Rule 65(b)(1) for this Court to justify issuing an *ex parte,* temporary restraining order to last not more than 14 days until a hearing on a preliminary injunction. Rule 65(b)(2).

**CERTIFICATION PURSUANT TO RULE 65(b)(1)**
**FOR IMMEDIATE RELIEF REQUESTED**

58. Plaintiff reiterates paragraphs 1 through 57 above and incorporates them by reference as if restated herein.

59. As recounted in paragraphs 32 to 38 above, Day Shelter Supervisor Larry, on order of defendant the Haven's Executive Director Owen Brennan, threatened plaintiff on September 22, 2025 with an inordinate, two-week suspension from all services at the Haven if plaintiff did not stop his mitigation of his two physical disabilities and place and store his specially-cut and disability-abating shoes, whether wet or dry, and his wet, padded bicycle shorts inside his plastic storage bin, where they will not be able to dry. This endangers plaintiff with ending up, immediately if there is a rainy spell in the weather, with no pair of shoes he can wear to walk, and with a severe case of butt boils that will prevent him from being able to sit or ride a bicycle, his sole means of transport, in addition to walking. If the weather turns cooler, and especially at night when plaintiff sleeps outdoors in a tent, the consequences of inability to walk and sit will be profoundly damaging for him.

60. Either plaintiff abides by the Haven's directive summarized in the preceding paragraph, or else he risks getting suspended for two weeks, or longer, from all of defendant the Haven's services upon which he presently relies for his lifeblood, which act itself will not only

harm plaintiff, but it will also compound the risk of his succumbing to his two physical disabilities, as summarized in the preceding paragraph.

61. Defendant the Haven imposed this quandary on plaintiff expressly because he asked it for a reasonable modification to whatever policy it has regarding storage of items inside a guest's plastic bin, a modification that clearly will not cause it to fundamentally alter the nature of its services. 42 U.S.C. section 12182(b)(2)(A)(ii). Therefore, plaintiff is highly likely to succeed on the merits and the balance of the equities tips in his favor. Winter, 555 U.S. at 20.

62. Given the foregoing scenario, there is a substantial likelihood that the mere act of notifying defendant the Haven of a hearing before this Court temporarily restrains the defendant from violating 42 U.S.C. section 2000a-2(b) and (c) could prompt it to take action against plaintiff leading to his suspension or banning on other, pretextual grounds, which depending on the weather, will cause immediate and irreparable injury, loss and damage to him, the ability to walk to and sit anywhere, conceivably leading to death.

WHEREFORE, the premises considered, plaintiff requests that this Court grant the relief requested foregoing and such further relief as is just.

Further your declarant sayeth naught on this 23rd day of September, 2025 in Charlottesville, Virginia.

Respectfully submitted,

CLAUDE DAVID CONVISSER
Plaintiff, by counsel

_______________________________

Claude David Convisser,
Attorney at Law
Virginia State Bar No. 33799
P.O. Box 7206
Charlottesville, Virginia 22906
5013 South Louise Ave., # 262

Sioux Falls, South Dakota 57108
Tel. 703-438-0071
cdc@popdiesel.com